Good morning, Your Honors. Doug Keller from Federal Defenders on behalf of Defendant Appellant Salvador Alonso. I plan to try to reserve two minutes of my time for rebuttal, so I'll keep an eye on the clock. Just keep track of the clock. I wanted to start with two things that I think the parties agree about in this case. The first thing is that if the government had not thrown Mr. Alonso out of the country and ordered him not to return back in 1987, he would have started serving his sentence in the summer of 1988, shortly after this Court affirmed his conviction. The second thing the parties agree about in this case is that if Mr. Alonso had started to serve his sentence back in 1988, he would have had the right to file a Rule 35 motion asking for sentencing leniency, the right every other defendant convicted during that time period had. The dispute on appeal is whether this 20-year period from when Mr. Alonso should have started serving his sentence, from when he did, caused by the deportation, whether that time lag should deprive Mr. Alonso of the ability to file a timely Rule 35 motion. Well, you say timely. I suppose he could have filed a Rule 35 motion from Mexico. Well, you know, Mr. Alonso doesn't dispute he physically could have filed a Rule 35 from Mexico, but the question is it would have served no purpose at that point. Essentially, the government, through the INS, unilaterally transformed Mr. Alonso's sentence from a prison term to banishment. And so asking for a sentence reduction at that point would have served no purpose. Well, I mean, that may be the consequence you give to what occurred. But nobody changed any term of imprisonment. Well, there was no legal effect. There was no, you know, his sentence wasn't, in fact, legally changed. But from Mr. Alonso's perspective, he no longer had to serve his sentence. He was thrown out of the country and told not to come back. And I think it's important, and I didn't highlight this in my brief like I should have, but after Mr. Alonso was denied bond-pending appeal and he was picked up by immigration, immigration, he told immigration about his criminal case. His attorney told immigration about his criminal case. Despite that, despite immigration knowing he had some sort of criminal case pending, they still threw him out of the country. So I think that's — It's a hard case that way. I'm sorry, Your Honor? It's a hard — it's what they call hard cases. You know, it's a hard case that way, I think. Well, and I think perhaps maybe the tiebreaker here in the way I view this case is the question is, who should have bore the burden of correcting the government's deportation? The government — the government's position — So did you say correcting the deportation? Right. Or correcting the — correcting the misunderstanding that it had created that Mr. Alonso didn't need to serve his sentence. The government's perspective seems to be that Mr. Alonso was under some sort of affirmative obligation to get back into contact with out-of-the-corridors probation officer, someone who could have told him, no, you actually need to come back to serve your sentence. But I think all the cases dealing with tolling under old Rule 35 put the burden on the government to correct its mistake. For instance, in — Yeah, but you keep using the word mistake. The deportation was — certainly was not a mistake. Well, it wasn't a mistake in the sense that the government, you know, had a legal right to deport Mr. Alonso. Yes. Right. But if it wanted to do that, that's fine. But then it certainly can understand why Mr. Alonso would think, okay, I've been thrown out of the country, I shouldn't come back. And that if the government wants to stick by its deportation, then when he showed up at the border and asked to come back on a humanitarian visa, they should have said, well, no, we've thrown you out of the country, that's the end of it. But they didn't do that. They've now rearrested him and expect him to serve a sentence, which Mr. Alonso isn't challenging whether the government has a right to punish him 20 years later. The only question is, should this 20 years be held against him? And should he lose this right he otherwise would have had? What does the record show in terms of the defendant's last effort to contact the district court? He did have some contact, did he not, once he went to Mexico? He had contact with his attorney. My understanding is after he was — With his attorney? That's right. But not with the court. Not with the court. And what about the attorney with the court? My understanding is the attorney did not contact the court. The attorney — the first the court heard about Mr. Alonso being deported was at the mandate-spreading hearing. And my understanding also is the government never made an effort to locate Mr. Alonso. The government, after it deported him or even after the mandate-spreading hearing, made no effort to locate him, made no effort to extradite him, and, in fact, exonerated the bond in the case, which I think goes back to my primary point, which is that if you're going to lay this — the burden with one side or the other, to me it made sense to say, look, the government made a mistake here, in the sense that it didn't mean to deport him before he started to serve his sentence. And the government should bear the burden of correcting that mistake, not Mr. Alonso. I guess — I mean, you'd have — if you were being charged with failure to appear, I think you'd have a perfect defense. He couldn't appear because the immigration service threw him out of the country. I don't know whether it delays the time for filing a Rule 35 motion, because his presence isn't essential for that. I don't know. That's the problem you're facing now. I mean, I understand your argument. Right. And, you know, certainly if you were being charged with failure to appear, I think his argument would be even stronger. But I think it's important to remember here, he's not arguing that he shouldn't serve his sentence. All he's arguing essentially for is to be allowed to have the right he would have had, but for the government's deportation. And, you know, I think the parties, and certainly I focus a lot on the tolling cases, but ultimately the tolling standard is from the Supreme Court's case in Fallon and Rule 2 of the Rules of Criminal Procedure, which tell this Court it should do justice in this case depending on the facts and circumstances of the case. And I think given the facts and circumstances of this case, justice is to allow Mr. Long to have the right he would have had, but for the government's deportation. If the Court has no further questions, I'll save the rest of my time for a moment. You may do so, counsel. We'll hear from the Governor. Good morning, Your Honors. My name is John Parma. I'm an assistant U.S. attorney in San Diego. I'm the most recent attorney appointed to the case. I was not the original attorney on the case before my time. There's three points I'd like to make to the Court. First of all, this is a little bit of a phantom issue. There was never any intention of the defendant to file a Rule 35 at the time, and I think the record bears that out. At the time, there was a conditional plea. We know that. A conditional plea. I need to caution the Court also that the record is sparse here. There was no ñ there was a docket. There was no information in the docket. The government has lost its file. We contacted some defense attorneys. They've lost their files. The district court was eventually able to order some transcripts and reconstruct from the transcripts some of what had happened. So, for example, we know that there was a conditional plea. It was referenced in the transcripts, but there's no plea agreement. We can't find the plea agreement. But there was a conditional plea, and the only issue on the plea was this Miranda issue, which went out before the Ninth Circuit and was rejected. There was never any issue as to what the sentence should be and whether or not the defendant's sentence was appropriate. And if you look at the record, it said, the counsel at the time said, if his appeal fails, he has to go to jail for five years. That's what the magistrate said at the time he was setting the bond on the appeal, and his counsel agreed. Sure, he understands that. There's never any doubt that he was going to be incarcerated for 60 months. In fact, the district court recently found that what had really happened here was a sentence avoidance. It was not a sentence reduction he was seeking. He received a windfall. He received a windfall in a couple of ways. He was removed to Mexico, and he didn't have to serve his five-year sentence. If he had remained in Mexico and he had never attempted to come back and cross into the United States, we wouldn't be here. There would be no ability to get jurisdiction over him to have him serve his sentence. Also, for reasons which are unclear in the record, there was no revocation of the bond. So even though he had posted a $250,000 bond with some property from his in-laws or some relatives, that was never forfeited. So he was removed to Mexico. But wait a minute. There was a reference to an exoneration. Is that the same bond we're talking about? Yes. Yes. So in the record, again, it's unclear as to what the thought process was. But I think it's probably apparent that I think a reasonable conjecture would be that after he was removed to Mexico and that it wasn't his choice to be removed to Mexico, that, you know, the innocent parties who were the relatives were saying, hey, you moved him to Mexico and now you want to forfeit this bond? We don't have any evidence of that in the record, but I think that's a reasonable supposition. So that was my first point, that there was never any intention here of filing Rule 45. More importantly, there was never any good faith effort from this individual to file something. I think the cases that we've cited, I think the Peltier case out of the Eighth Circuit, is pretty instructive here that there's got to be some effort on the defendant's part to do something to rectify if there's some kind of government conduct. He had the ability to do so. He was in contact with his attorney, and the timing of that is interesting. His attorney said at the mandate spreading hearing, is your client here? No, he's not here. Well, what happened? Well, he got sent down to Mexico. Did you tell the court about it? We could have done something about it. No, I didn't tell the court about it. Well, have you been in contact with him? Yes, I've been in contact with him for a few months. And then a couple of months ago, contact dried up. But I've been in contact with his wife. Really? What did his wife say? Well, I talked to her. She was asking, they were both asking about the appeal. How long is this going to take? What's going to happen? And finally, I was able to tell the wife that his appeal had been denied. So there's no evidence in the record that he was in contact with his wife and that his wife told him that, hey, guess what, you lost your case. But I think that's a reasonable conclusion to draw. So he made no effort. He had the ability to contact his attorney. He had a telephone. He had contact with his pretrial officer. He had relatives in San Diego. He made no effort to do so. I understand that's a little unusual circumstance. I mean, we put him in Mexico to ask him to file Rule 35. I think that's unusual. But there's no question that he could have. He didn't want to. There was no reason for him to do it. He was free and clear in his own country. Finally, Your Honor, I'd like to say that the ---- He may not have understood that. He may not have understood that. Or he may have understood that he was free and clear and that the sentence was gone because he applies for humanitarian leave and puts down his own name and, you know, we don't have any evidence in the record at all as to what his state of mind was, either at the time, either while he was in Mexico, or when he came to the port of entry and asked for humanitarian leave. I doubt that he thought a warrant was out for his arrest. Well, you know, we'd already made one mistake. Maybe we lost the warrant, too. I mean, it's been 20 years. What we do know is that he was in contact with his attorney following the case. So why would he, you know, it strains common sense a little bit to say he gets arrested. He posts bail. There's hearings. He has a hearing on whether or not his confession or his statement was in violation of Miranda. He loses that issue. He goes through three attorneys. He appeals that issue. He eventually decides to plead guilty with a plea agreement. He goes to a sentencing hearing. He gets sentenced in front of Judge Brewster. He then asks for bail pending appeal. He gets bail pending appeal, and then he gets put in a van and put down in Mexico, that all of a sudden all those proceedings didn't mean anything, that all of a sudden, I mean, that's what they're asking you to find is that this was some kind of statement, that by doing that, that the statement was made to the defendant that, oh, my sentence has been commuted to deportation or something like that. There's no evidence of that, and the evidence is actually to the opposite. He's contacting his attorney and says in the record, you know, what's going on with my appeal? Why would he be following his appeal? Why would he care about a conviction if he'd already had his sentence commuted to five years or to deportation? I don't think that makes any sense, Your Honor, and I don't ‑‑ there's no evidence in the record to suggest that that's what happened. And the final point I'd like to make, Your Honor, is that there was no government action, I think I made this clear, that made it impossible. Like I said, he had contact with his attorney, and the district court kind of saw this, or excuse me, the magistrate court kind of saw this at the time, kind of anticipated this and put the burden on him specifically as a condition of his bail. If you look at, I think it's page 76 of the appellant's excerpts of record, it says that you're, he talks to his attorney now, he's responsible, you're partly responsible, he's the most responsible. He knew he was on bond, he signed a bond which limited his travel, he should have instructed you that work had to be done and work should have been done. In this particular case, Your Honor, I recognize, I understand counsel's position that he wants another bite at the apple, another opportunity to be sentenced. But the facts are pretty clear here. He went through the process, he got a sentence, we accidentally put him in Mexico. If, under his theory of the case, there's no finality, this would go on and on and on, the Rule 35 would toll indefinitely until he decides at his leisure or at his discretion to come back and seek it. Once we put him in Mexico, as part of, if his theory could go on for 10 years, 20 years, 50 years, until he decides to make application, and then the tolling would stop. And that's what the argument, that's what the district court found. The district court here found that there was no government action which frustrated his ability to do so, that he received a benefit from this, and that there's no evidence in the record to suggest that he was going to file a Rule 35, that he traveled to file a Rule 35, or that we did anything to frustrate them. Now, I recognize also that this is, you know, a sympathetic individual, and that, you know, the district court said that if I had the opportunity to resentence him, I might resentence him differently. I recognize that. But I'm asking the court to not find jurisdiction where there is no jurisdiction, and there's no reason to suggest, under the facts of this case, that the court should toll 120 days for about over 7,000 days. And unless the court has any questions, I would submit. No questions. Thank you, counsel. I appreciate it. Thank you. Mr. Keller, you have some reserve time. Thank you, Your Honor. Just to address a couple of points the government just made. First, regarding the idea that Mr. Alonzo must have known, given he went through all these proceedings, had bail, et cetera, et cetera, he must have known that there was something still pending. You know, in the Southern District of California, we constantly have to disabuse our clients of the notion that getting bail means you've won your case, because in Mexico, oftentimes, that's what happens. You post bail, and then your case is done with. Two, the government started by saying that Mr. Alonzo never had an intention to file Rule 35. Well, back in 19 — back in the early 1980s, these notions were regularly filed almost in every single case. And I think everyone in this case understood that at some point he would file Rule 35 asking for sentencing, they say. So I — the record is silent as to that fact, but I think it's just something that everyone assumed back then you would do. So, yes, you were sentenced to a certain term of imprisonment, and inevitably, if our office represented you, someone would file Rule 35 on your behalf. Three, the government's — What would the issue have been, though, if that were the case? What would ground the Rule 35 20 years ago? Well, a few things. One, there was about a year time lag from when he was sentenced to when he would have had to file a timely Rule 35 because of the time this court took to resolve his appeal. And my understanding from talking to some of the more senior lawyers in my office is it wasn't that uncommon for a judge simply to decide to reduce his sentence after a certain amount of time, just, you know, for whatever reason. Without a showing of a physical disability or something else? Yes. I mean, my understanding is that certainly some judges were more liberal with it than others, but it wasn't that uncommon to get one granted. For instance, this gentleman would have had about a year, and if he would have been immediately remanded to custody, he could have explained that he had been good in prison or that, you know, whatever his timing situation was, I think he was having problems with his stomach at that point. He could have provided all that to the district court, and the district court could have decided to give him a sentence reduction. Although, you know, since he never had that opportunity, we don't know what the judge would have done. The government also made a reference to a windfall. And I think Mr. Honza would definitely disagree with that. He's he's since he's been serving his time in a wheelchair, it's been incredibly difficult for him. I'm sure, you know, looking back on it, he much would have rather to have served his sentence back when he was young and healthy and could have done his time relatively easily relative to doing it now when he can't even use the restroom by himself. Well, the windfall, I suppose, is just not going right to prison. Right. But I mean, it's a really unfortunate case. And as it is now, I understand your point. But I guess it wasn't the government's responsibility to protect him from the accident. Right. Well, that's certainly true. But if, you know, if we're going to start talking about general equities like windfall, I think it's certainly understandable that Mr. Alonzo would want to present his, you know, volume of equities in this case. You know, it's also if the government has its way, I mean, that Mr. Alonzo is going to lose his right to file Rule 35, a right he would have had but for this deportation. So I think that those are all my points. Unless the Court has further questions, I'll submit. Did he challenge his deportation in any procedure? Yes. My understanding from the little record we have of that is that he explained to the INS, you know, his situation. He first asked us to be released essentially on his criminal bond. I guess that was common back then. They said no. He then asked for a nominal immigration bond. I think he asked for $5,000 or $10,000. They said no again. But he didn't file a habeas or anything to challenge his removal? He didn't file a habeas. I mean, I assume it happened fairly quickly. They picked him up. It seemed like this all sort of happened, bang, bang. They said no, you're deportable. Then threw him out of the country. I don't think there was really an opportunity to do more. Court, no further questions? No questions. Thank you, Your Honor. The case just argued will be submitted for decision. And we will hear argument next in United States v. Floresta.
judges: Canby, Hall, O'Scannlain